James E. Cecchi
**CARELLA BYRNE CECCHI**
**BRODY & AGNELLO, P.C.**
5 Becker Farm Road
Roseland, New Jersey 07068
Telephone: (973) 994-1700
jcecchi@carellabyrne.com

*Attorney for Plaintiffs*

[*Additional Attorneys on Signature Page*]

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| MARY JANE CASTLE and BRANDI BALDWIN-JONES, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>JOHNSON & JOHNSON and KENVUE INC.,<br><br>Defendants. | Civil Action No. _____<br><br><br>**COMPLAINT**<br><br><br>**DEMAND FOR JURY TRIAL** |

## TABLE OF CONTENTS

**Section**                                                                **Page**

I.     INTRODUCTION ................................................................................. 1

II.    JURISDICTION ................................................................................. 2

III.   VENUE ................................................................................................ 2

IV.    PARTIES ............................................................................................ 2

       A.     Plaintiffs ................................................................................. 2

       B.     Defendants ............................................................................. 4

V.     FACTUAL ALLEGATIONS .............................................................. 4

       A.     Defendants' Products and Marketing.................................... 4

       B.     PFAS in Defendants' Products ............................................. 8

       C.     Exposure to PFAS is Harmful............................................. 12

       D.     Defendants' Wrongful Concealment and Omissions........... 17

VI.    TOLLING OF THE STATUTE OF LIMITATIONS........................ 21

       A.     Discovery Rule Tolling........................................................ 21

       B.     Fraudulent Concealment Tolling ......................................... 22

       C.     Estoppel................................................................................ 22

VII.   CLASS ALLEGATIONS .................................................................. 22

VIII.  CLAIMS ............................................................................................ 25

COUNT I FRAUDULENT CONCEALMENT (COMMON LAW) (Alleged by
       Plaintiffs Castle and Baldwin-Jones on behalf of the Nationwide Class or,
       in the alternative, the Michigan Subclass) ........................................ 25

COUNT II FRAUDULENT OMISSION (COMMON LAW) (Alleged by
       Plaintiffs Castle and Baldwin-Jones on behalf of the Nationwide Class or,
       in the alternative, the Michigan Subclass) ........................................ 27

COUNT III UNJUST ENRICHMENT (COMMON LAW) (Alleged by Plaintiffs
       Castle and Baldwin-Jones on behalf of the Nationwide Class or, in the
       alternative, the Michigan Subclass) ................................................. 28

COUNT IV VIOLATIONS OF THE MICHIGAN CONSUMER PROTECTION
ACT ("MCPA)  (Mich. Comp. Laws § 445.903, *et seq.*) (Alleged by
Plaintiffs Castle and Baldwin-Jones on behalf of the Michigan Subclass) ..................... 29

COUNT V BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
UNDER MICHIGAN LAW (Mich. Comp. Laws Ann. § 440.2314)
(Alleged by Plaintiffs Castle and Baldwin-Jones on behalf of the Michigan
Subclass) ........................................................................................................................... 31

COUNT VI BREACH OF EXPRESS WARRANTY  UNDER MICHIGAN LAW
(Mich. Comp. Laws Ann. § 440.2313) (Alleged by Plaintiffs Castle and
Baldwin-Jones on behalf of the Michigan Subclass) ........................................................ 32

REQUEST FOR RELIEF ............................................................................................................ 34

DEMAND FOR JURY TRIAL .................................................................................................... 35

Plaintiffs Mary Jane Castle and Brandi Baldwin-Jones ("Plaintiffs") file this lawsuit individually and on behalf of a proposed Nationwide class and a Michigan Subclass. Plaintiffs allege the following against Defendants Johnson & Johnson ("J&J") and Kenvue Inc. ("Kenvue") (collectively, "Defendants"), and state as follows:

## I.    INTRODUCTION

1.      Defendants manufacture, market, and sell adhesive bandages, in a variety of shapes, sizes and designs, under the tradename "Band-Aid" to consumers across the United States, including Michigan.

2.      Defendants' Band-Aid products ("Band-Aid" or "Products") were invented over a century ago and treat cuts, scrapes, burns, and other abrasions on the skin.

3.      Defendants' Products' packaging states that they are made with "stretchable, comfortable fabric" are "designed to wick away fluids and keep your wound clean" and that "[f]or best results, apply bandage to clean dry skin. Change bandage daily, when wet, or more often if needed."

4.      Defendants' Products' packaging further states that the Products provide "[t]rusted protected for healing wounds."

5.      However, unbeknownst to consumers, certain Products sold by Defendants are dangerous, unmerchantable, and unfit for their intended purpose because they contain per- and polyfluorinated substances referred to as "PFAS," which epidemiologic and laboratory studies have shown present dangers to human health, even when exposure occurs at very low levels.

6.      PFAS exposure has been associated with many serious health problems, including increased risk of cancer, thyroid disease, high cholesterol, ulcerative colitis, immunological abnormalities, developmental and reproductive effects, as well as a number of other toxicological effects.

7.      PFAS chemicals bio accumulate in the tissue of living organisms, including humans, and once they enter the human body, it takes a very long time to get rid of them.

8.      The half-life of long-chain PFAS chemicals ranges from three to seven years.

9.      Accordingly, Plaintiffs bring this class action against Defendants on behalf of themselves and other similarly situated consumers who have purchased the Products.

## II.      JURISDICTION

10.     This Court has original jurisdiction over this lawsuit under the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d)(2) and (6), because Plaintiffs and Defendants are citizens of different states; there are more than 100 members of the Class and the Subclass (as defined herein); the aggregate amount in controversy exceeds $5 million, exclusive of attorneys' fees, interest, and costs; and class members reside across the United States. The citizenship of each party is described further below in the "Parties" section.

11.     This Court has personal jurisdiction over the Defendants by virtue of its transactions and business conducted in this judicial district, and because Defendants are located in New Jersey. Defendants have transacted and done business, and violated statutory and common law, in this judicial district.

## III.      VENUE

12.     Venue is proper in this judicial district under 28 U.S.C. § 1391 because Defendants transact substantial business and are headquartered in this district. Additionally, a substantial part of the conduct giving rise to Plaintiffs' claims occurred in this District.

## IV.      PARTIES

### A.      Plaintiffs

13.     Plaintiff and proposed class representative Mary Jane Castle is a resident and citizen of Waterford, Michigan. Plaintiff Castle has purchased Band-Aid Flexible Fabric

Comfortable Protection Bandages from a retail location in Michigan. At the time of purchase, Plaintiff Castle believed the Product was safe, reliable, and free of any dangerous chemicals. Plaintiff Castle reviewed and relied on the advertising and marketing of the Product, which stated that they were "trusted protection" for her "healing wounds" and were the "#1 Doctor Recommended" brand. At no point did Defendants warn or disclose to Plaintiff Castle that the Product contained PFAS chemicals. If Defendants had disclosed that the Product contained PFAS chemicals, she either would not have bought the Product or would have paid less for the Product. As a result of Defendants' misrepresentations, omissions, and deceptive conduct, Plaintiff Castle has suffered, and continues to suffer, economic harm. In addition to overpaying for the Product, Plaintiff Castle has now had to purchase different bandages. Plaintiff Castle would consider purchasing Defendants' Products in the future if Defendants manufactured the Products to ensure there were no PFAS chemicals.

14. Plaintiff and proposed class representative Brandi Baldwin-Jones is a resident and citizen of Northville, Michigan. On February 9, 2024, Plaintiff Baldwin-Jones purchased Band-Aid OURTONE Flexible Fabric bandages from a Target store located in Livonia, Michigan. At the time of purchase, Plaintiff Baldwin-Jones believed the Product was safe, reliable, and free of any dangerous chemicals. Plaintiff Baldwin-Jones reviewed and relied on the advertising and marketing of the Product, which stated that they were "trusted protection" for her "healing wounds" and were the "#1 Doctor Recommended" brand. At no point did Defendants warn or disclose to Plaintiff Baldwin-Jones that the Product contained PFAS chemicals. If Defendants had disclosed that the Product contained PFAS chemicals, she either would not have bought the Product or would have paid less for the Product. As a result of Defendants' misrepresentations, omissions, and deceptive conduct, Plaintiff Baldwin-Jones has suffered, and continues to suffer,

economic harm. In addition to overpaying for the Product, Plaintiff Baldwin-Jones now much purchase different bandages. Plaintiff Baldwin-Jones would consider purchasing Defendants' Products in the future if Defendants manufactured the Products to ensure there were no PFAS chemicals.

**B.     Defendants**

15.     Defendant Johnson & Johnson is a New Jersey corporation, with its principal place of business located at One Johnson & Johnson Plaza, New Brunswick, New Jersey.

16.     Defendant Kenvue is a Delaware corporation, with its principal place of business located at 199 Grandview Road, Skillman, New Jersey. Kenvue was formally the Consumer Healthcare division of Johnson & Johnson. In 2023, Kenvue separated from Johnson & Johnson and became an independent company. Kenvue currently owns the Band-Aid brand.

17.     Defendant Johnson and Johnson has manufactured, marketed, and sold the Products nationwide, including in California and New Jersey, for over 100 years. Recently, Defendant Kenvue began to manufacture, market, and sell the Products nationwide. Both Defendants manufactured, marketed, and sold the Products at issue nationwide during the relevant time period.

## V.     FACTUAL ALLEGATIONS

**A.     Defendants' Products and Marketing**

18.     Defendants manufacture, market, and sell bandages under the brand name "Band-Aids" which is described by Kenvue as being "the most-trusted brand in the U.S." and which J&J's in-house historian describes as being a "trusted household product." In fact, the Products' packaging touts it as being "The #1 Doctor Recommended Brand."

19.     The Products include "Flexible Fabric Non-Stick Sterile Adhesive Bandages" that feature a "QUILT-AID Comfort Pad designed to cushion painful wounds while you heal."



20.     Defendants' "OURTONE Flexible Fabric Adhesive Bandages are skin tone complementing," and come in three shades (BR45, BR55, and BR65) "for Black & Brown skin tones."



21.    The Products at issue are described on their packaging as being "The #1 Doctor Recommended Brand," that provide "trusted protection for healing wounds."






22.     Defendants' products contain a QUILT-AID pad "designed to wick away fluids and keep your wound clean" and that "[c]ushions painful wounds while you heal." These pads make direct contact with a user's open wound.



23.     Defendants' Products "have been used by millions – even billions – of people for more than a century" and Defendants' have prospered by e cultivating a brand image based around trust, safety, quality, and health.

24.     Despite this, the packaging of Defendants' Products fail to disclose to consumers the presence of PFAS.

25.     Consumers have and continue to purchase Defendants' Products under the reasonable belief that these products do not contain synthetic chemicals that have the ability to adversely impact their health or the health of their families.

**B.     PFAS in Defendants' Products**

26.     PFAS refer to a large group of manufactured chemicals used in numerous industries and products.

27.     The presence of PFAS in Defendants' Products poses a serious risk to the health and safety of Plaintiffs and other consumers of the Products.

28.     A new consumer report commissioned by Mamavation, an online parenting community and website, in partnership with Environmental Health News, tested several types of bandages in an EPA-certified lab to ascertain whether consumers were being exposed to PFAS when they were bandaging up open wounds.[1]

29.     In conducting the study, bandages were purchased and donated from Mamavation community members between November 2022 and February 2024 from either Walmart, CVS, Rite Aid, Target, or Amazon. Each product was recorded in the Mamavation database and then sent directly to the lab within its original packaging for testing.

30.     Mamavation sent 40 bandages from 18 brands to an EPA-certified laboratory looking for indications of toxic PFAS chemicals. Among the bandages tested were Defendants' Products, including Band-Aid Flexible Fabric Comfortable Protection Bangages, and each of the three shades of Band-Aid OURTONE Flexible Fabric Bandages (BR45, BR55, and BR65).

31.     Mamavation's EPA-certified lab used marker testing to identify the potential presence of PFAS in bandages. Organic fluorine is a marker for PFAS because all PFAS chemicals are carbon-based compounds that contain fluorine.  The specific lab method used to test for total fluorine was the Determination of Total Fluorine by Oxygen Flask Combustion and Ion-Selective

---

[1] Leah Segedie, *"Band-Aids" & Bandages with Indications of PFAS "Forever Chemicals" Report*, MAMAVATION (2024), https://www.mamavation.com/health/band-aids-bandages-pfas-forever-chemicals-report.html (last visited May 9, 2024).

Electrode. If total fluorine was observed at a detection level of 10 ppm or greater, the lab did the Determination of free Fluoride Ion in the product by Ion-Selective Electrode and then subtracted that from the Total Fluorine to determine the amount of organic fluorine. This marker testing is likely to show the presence of PFAS. Organic fluorine can also capture other fluoropolymers, pharmaceuticals, and common hydrofluorocarbon refrigerants, such as 1,1,1,2-tetrafluoroethane (commonly known as R-134a) and 2,3,3,3-tetrafluoropropene (commonly known as HFO-1234yf), which are all also PFAS.

32.     Testing for organic fluorine, by way of total organic fluorine analysis, has recently emerged as a novel indicator that encompasses the total content of both known and unknown types of PFAS. This is because organic fluorine is the foundational element and defining characteristic of PFAS.[2]

33.     In chemistry, the term organic refers to compounds containing carbon. Organic fluorine is created by the chemical bond between carbon and fluorine atoms. Fluorine and carbon are the two elements that form the backbone of PFAS, and the carbon-fluorine bond is one of the strongest in organic chemistry, which keeps them from deteriorating naturally and gives them an extremely long life – this is why PFAS are also referred to as "forever chemicals." PFAS is a category of thousands of manufactured chemicals, defined by their bonds between carbon and fluorine molecules. Many researchers consider total organic fluorine testing to be the most accurate. It is critical for detection of PFAS as it can identify if any PFAS is present at all, and

---

[2] Anna S. Young et al., *Organic Fluorine as an Indicator of Per- and Polyfluoroalkyl Substances in Dust from Buildings with Healthier versus Conventional Materials*, 56 ENVIRON SCI TECHNOL 17090 (2022), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC9730836/ (last visited May 9, 2024).

because organic fluorine is the identifying element of PFAS, detection of it in a sample necessarily means that PFAS is present in some form.[3]

34.    Total organic fluorine testing only measures fluorine that originates from a substance where fluorine is attached to a carbon backbone, thus total fluorine testing does not detect other forms of fluorine, such as inorganic fluorine (i.e., fluoride).

35.    Organic fluorine does not exist naturally in humans and – with a few exceptions – is not biosynthesized by living organisms. Naturally occurring organic fluorine is extremely rare and is practically nonexistent outside of its use in made-made PFAS.

36.    Unlike other targeted analyses which can identify either only a limited number of known and identifiable PFAS or which are not considered to be a reliable proxy for PFAS because they include inorganic fluoride in addition to organic fluorine, total organic fluorine testing is the only method that can reliably test for known and unknown types of PFAS and is widely accepted by experts as the reliable method to detect PFAS in a sample.

37.    According to Scott Belcher, Ph.D. & Associate Professor with the Center for Environmental & Health Effects of PFAS at North Carolina State University says "fluoropolymers, such as polytetrafluoroethylene (PTFE), are extremely common forms of PFAS that could be contributing to the organic fluorine found in bandages. Methods used for detecting individual PFAS, such as PFOA or GenX, cannot directly identify PTFE. However, the analysis of total

---

[3] *Id.; see also* ALEXANDRIA FORSTER, YING ZHANG & SUSAN RICHARDSON, *Development of a Total Organic Fluorine Method for the Analysis of Process Wastewater Streams and Air from Fayetteville Works (NC)*, (2021), https://www.chemours.com/en/-/media/files/corporate/fayetteville-works/final-tof-report--12-31-21.pdf?rev=780bb9c3e4064b6397c313f6fa09243e&hash=EC54D06E8A1FB206DAEAC84B51D82CFA.; Junli Wang et al., *Quantification of Per- and Polyfluoroalkyl Substances with a Modified Total Organic Carbon Analyzer and Ion Chromatography*, 3 AWWA WATER SCIENCE e1235 (2021), https://awwa.onlinelibrary.wiley.com/doi/10.1002/aws2.1235 (last visited May 9, 2024).

organic fluorine (TOF) does account for all PFAS contaminants in bandages, including PTFE. Therefore, this method of testing serves as a good 'spot-check' of consumer products."[4]

 38. Of the products tested in the Mamavation and Environmental Health News study, Defendants' Products contained the following ppm levels of organic fluorine:

  a. Band-Aid Flexible Fabric Comfortable Protection Bandages – 188 ppm organic fluorine on the absorbent pad.

  b. Band-Aid OURTONE Flexible Fabric BR45 Bandages – 262 ppm organic fluorine on absorbent pad.

  c. Band-Aid OURTONE Flexible Fabric BR55 Bandages – 250 ppm organic fluorine on absorbent pad.

  d. Band-Aid OURTONE Flexible Fabric BR65 Bandages – 260 ppm organic fluorine on absorbent pad.

 39. Linda Birnbaum, Scientist Emeritus and Former Director of the National Institute of Environmental Health Sciences and National Toxicology Program & Scholar in Residence at Duke University, and Adjunct Professor at both University of North Carolina, & Yale University, in response to the results of the studies stated: "Because bandages are placed upon open wounds, it's troubling to learn that they may be also exposing children and adults to PFAS. It's obvious from the data that PFAS are not needed for wound care, so it's important that the industry remove their presence to protect the public from PFAS and opt instead for PFAS-free materials."

---

[4] Segedie, *supra* note 1.

## C.     Exposure to PFAS is Harmful

40.     PFAS chemicals are environmentally persistent. They do not break down for hundreds, and perhaps thousands, of years. Microbes in the environment do not consume PFAS chemicals, which contribute to their persistence.

41.     PFAS are thermally, chemically, and biologically stable and resistant to biodegradation, atmospheric oxidation by light, direct photolysis, and hydrolysis.[5]

42.     While PFAS is the preferred term for this class of chemicals, other commonly used terms for PFAS include: Perfluorinated chemicals, Perfluorochemicals, Perfluoroalkyls, Perfluorinated alkyl acids, Polyfluorinated chemicals, Polyfluorinated compounds, and Polyfluoroalkyl substances, as well other acronyms, including, PFOA, PFOS, PFAA, PFC, PCBs, PFA, PFOS, among many others.[6]

43.     In 2009, PFOS, its salts, and perfluorooctane sulfonyl fluoride were as Persistent Organic Pollutants under the Stockholm Convention due to their ubiquitous, persistent, bioaccumulative, and toxic nature.

44.     In 2020, the European Food Safety Authority published a report discussing the risks associated with PFAS in food.

45.     The U.S. Environmental Protection Agency (EPA), the International Organization for Standardization, and ASTM International (formerly known as the American Society for Testing

---

[5] ERIN L. PULSTER ET AL., *Guide to Per- and Polyfluoroalkyl Substances (PFAS) Sampling within Natural Resource Damage Assessment and Restoration*, (2024), https://pubs.usgs.gov/publication/ofr20241001/full (last visited May 9, 2024).
[6] Per- and Polyfluoroalkyl Substances (PFAS), NATIONAL TOXICOLOGY PROGRAM, https://ntp.niehs.nih.gov/whatwestudy/topics/pfas (last visited May 9, 2024); *See also* PFAS Definition and Related Acronyms | Fisher Scientific, https://www.fishersci.com/us/en/scientific-products/selection-guides/pfas-definition-related-acronyms.html (last visited May 9, 2024).

and Materials) now require manufacturers to identify and quantify PFAS, PFOA, PFOS, PFAA, and PFC in their raw materials, industrial products, and consumer goods.

46.     On April 10, 2024, the Biden Administration issued a national, legally enforceable drinking water standard to protect communities from exposure to PFAS. This first of its kind standard sets a maximum contaminant level of 4 parts per trillion for PFOA and PFOS individually. The maximum level for other forms of PFAS is 10 parts per trillion.

47.     For context, the absorbent pad on Defendants' Band-Aid OURTONE Flexible Fabric BR45 Bandages has a PFAS level in the amount of 262 parts per million. This equates to a level of PFAS that is 2,620,000 times greater than the maximum level set forth by the government on drinking water.

48.     Toxicology studies show that PFAS are readily absorbed after ingestion or inhalation exposure.

49.     PFAS and related chemicals bioaccumulate in the tissue of living organisms, including humans. Humans consume these chemicals at a rate much faster than they can excrete them. Once they enter the human body, it takes a very long time to get rid of PFAS and related chemicals. The impact of the exposure can last forever and be fatal.

50.     There are two different classifications of PFAS: short-chain or long-chain, depending on the amount of carbon atoms found on the chain of the PFAS. Depending on their chemical make-up, long-chain PFAS compounds are typically defined as having more than six to eight carbons, while short-chain compounds usually consist of less than six to eight carbons.[7]

---

[7]     What are PFAS? | TWRI, https://twri.tamu.edu/news/2023/february/what-are-pfas/#:~:text=Per%2D%20and%20polyfluoroalkyl%20substances%2C%20or,the%20strongest%20known%20chemical%20bonds. (last visited May 9, 2024).

51.     Long-chain compounds have different rates of solubility, transport and toxicity than short-chain compounds, and long-chain PFAS have been banned in the European Union and phased out by major U.S. manufacturers due to their health risks.

52.     Studies by the Center for Disease Control and Prevention have shown that some PFAS are known to have long residence time in the body. It was previously thought that short-chain PFAS moved through the body faster than long-chain PFAS, but recent studies revealed that short-chain PFAS actually have an easier time building up, and staying, in our bodies. Regardless of chain-length, however, research from the U.S. National Toxicology Program suggests that both long- and short-chain PFAS have similar levels of toxicity.[8]

53.     The half-life of long-chain PFAS in the human body is between two to nine years. PFAS binds to albumin in the serum and is concentrated in the liver and kidneys.  So, if a human being consumed a quantity of PFAS on a given date, it would take two to nine years to excrete half of that quantity. That means that it takes about nine half-lives to excrete all of that quantity, a total of between 21 and 49 years.

54.     PFAS chemicals are readily absorbed in the human body and accumulate primarily in the blood serum, kidney, and liver.

55.     These chemicals can be passed from mother to infant through breastfeeding and through the umbilical cord in utero.

56.     There are numerous health risks associated with exposure to PFAS chemicals, and these risks exist even when the chemical is ingested or absorbed at purportedly low levels, such as less than 1.0 parts per billion (ppb).

---

[8] Short-chain and long-chain PFAS show similar toxicity, US National Toxicology Program says, CHEMICAL & ENGINEERING NEWS, https://cen.acs.org/environment/persistent-pollutants/Short-chain-long-chain-PFAS/97/i33 (last visited May 9, 2024).

57.     PFAS are associated with increased risk in humans of testicular cancer, kidney cancer, prostate cancer, non-Hodgkin's lymphoma, pancreatic cancer, ovarian cancer, thyroid disease, high cholesterol, high uric acid levels, elevated liver enzymes, ulcerative colitis, and pregnancy-induced hypertension, as well as other conditions.

58.     Epidemiological studies of PFAS exposure in animals have shown PFAS have the ability to cause other cancers not yet associated with human exposure.

59.     The EPA has also advised that exposure to PFAS may result in developmental effects to fetuses during pregnancy or to breastfed infants, liver damage, and various immunological effects.[9]

60.     Other studies in the United States and across the world have linked PFAS exposure to the following conditions, among others:

a.   cerebrovascular disease;

b.   increased diabetes mortality;

c.   immunologic abnormalities including, but not limited to, reduced immunologic response to vaccines by children, immune system suppression, and abnormal allergic responses;

d.   thyroid disorders and disease;

e.   liver disorders and disease;

f.   hormonal abnormalities;

g.   developmental and reproductive effects;

h.   neurological effects;

---

[9] Mid-Atlantic Center for Children's Health and the Environment, *Factsheet on Perfluoroalkyl Substances (PFAS) for Health Professionals*, (2021), www.pehsu.net/_Library/facts/PFAS_Fact_Sheet_May_2021.pdf.

      i.    increased risk of pancreatitis and pancreatic cancer; and

      j.    increased osteoarthritis.

61.     In May 2006, the EPA Science Advisory Board stated that PFAS cancer data are consistent with guidelines suggesting exposure to the chemical is "likely to be carcinogenic to humans."[10]

62.     Significantly, the health conditions set forth above can arise months or years after exposure to PFAS.

63.     According to the Food and Drug Administration, multiple peer reviewed studies have found that exposure to certain levels of PFAS may lead to negative health effects, and an increased buildup of PFAS in the body may also lead to a decreased immune system and affect endocrine systems.

64.     Dr. Philippe Grandjean, M.D., currently a Professor of Environmental Health at Harvard University's T.H. Chan School of Public Health, has conducted extensive research on PFAS chemicals and human health, and he recommends a maximum concentration level of ***1 ppt*** for these chemicals.[11]

65.     Findings from a study conducted by the National Institute for Occupational Safety and Health "demonstrate that dermal exposure to PFOA is immunotoxic and raise concerns about potential adverse effects from dermal exposure.[12]"

---

[10] Designation of Perfluorooctanoic Acid (PFOA) and Perfluorooctanesulfonic Acid (PFOS) as CERCLA Hazardous Substances, 89 Fed. Reg. 90, 39125 (May 8, 2024) (to be codified at 40 C.F.R. pt. 302).

[11] Philippe Grandjean & Richard Clapp, *Perfluorinated Alkyl Substances: Emerging Insights Into Health Risks*, 25 NEW SOLUT 147 (2015), http://journals.sagepub.com/doi/10.1177/1048291115590506 (last visited May 9, 2024).

[12] Hillary L. Shane et al., *Immunotoxicity and Allergenic Potential Induced by Topical Application of Perfluorooctanoic Acid (PFOA) in a Murine Model*, 136 FOOD AND CHEMICAL TOXICOLOGY

66.     According to the Agency for Toxic Substances and Disease Registry, there are no approved medical treatments available to reduce PFAS in the body. This means, according to experts, that preventing and/or reducing future exposures is the most important step to protecting oneself from PFAS. Including the avoidance of products known to contain PFAS.[13]

67.     In 2012 the Journal of the American Medical Association published a study concluding that PFAS exposure caused a reduced immune response to vaccines in children.

68.     In June of 2016, a peer-review panel of scientists, including epidemiologists, toxicologists, and microbiologists, concurred with the U.S. Department of Health and Human Services National Toxicology Program's findings that PFOS and PFOA can harm the human immune system.

69.     Injuries from PFAS exposure are not sudden. Instead, they can occur months, years, or even decades after exposure.

**D.     Defendants' Wrongful Concealment and Omissions**

71.     The Products manufactured, marketed, and sold by Defendants contain high levels of PFAS that were not disclosed to consumers, including Plaintiffs and Class Members.

72.     Defendants' packaging, labeling, and advertisements emphasize safety, quality, doctor recommendations, comfort, and trust.

73.     Using these assurances, Defendants have successfully developed brand recognition and a reputation as being "the most trusted brand in the U.S." and "a trusted household product."

---

111114 (2020), https://www.sciencedirect.com/science/article/pii/S0278691520300016 (last visited May 9, 2024).
[13]     PFAS Information for Clinicians - 2024 | ATSDR, (2024), https://www.atsdr.cdc.gov/pfas/resources/pfas-information-for-clinicians.html (last visited May 9, 2024).

74.     As a result of its brand recognition and reputation, Defendants are able to charge, and do charge, a premium for the Products they sell, when compared to the prices of comparable generic brands.

75.     J&J states that patient and consumer "safety when using our products is a critical priority for Johnson & Johnson: We insist on quality and safety at every stage of product development, manufacturing, supply chain, and commercialization," and that its Healthy Lives Mission aims to "enhance product transparency to help consumers make more informed choices about personal health products."

76.     On its website, Kenvue states that it "believe[s] in promoting a culture of integrity, ethics, and transparency to build trust and create meaningful, long-term value" and that Kenvue "aim[s] to advance the well-being of the communities in which we operate and equip them with innovative products and actionable information to make healthier decisions." Its website goes on to state that Kenvue "know[s] consumers care about the ingredients in the products they choose. At Kenvue, we also care fiercely about the ingredients we select which is why we are on a journey to provide more transparency and enable consumers to make informed purchase choices."

77.     Despite these claims, the packaging and labels on Defendants' products contain no disclosures concerning the presence of PFAS and reasonable consumers would believe Defendants' Products are free of harmful toxins.

78.      Had Plaintiffs and Class Members known the truth about Defendants' Products they would not have purchased on the same terms as they did.

79.     Plaintiffs' and Class Members bargained for Products that were free from toxins and were deprived of the basis of their bargain when Defendants sold Products to them that contained PFAS.

80.     As a result, Plaintiffs and Class Members suffered economic injuries as a result of their purchases of Defendants' Products.

81.     Defendants failed to warn consumers of the dangers of PFAS contained in their Products, the known adverse health effects associated with PFAS, as well as the quality, grade and true standard of the Products, despite having a continuous duty to do so since these facts pertain to a critical safety-related deficiency in their Product.

82.     As sellers, advertisers, and manufacturers or parties to a contract to manufacture, thereby providing and approving designs of the Products, Defendants were best situated to know the content of their Products. Yet, as discussed herein, Defendants concealed and affirmatively misrepresented the true nature of their Products.

83.     Given Defendants' failure to disclose the presence of PFAS in their products, and absent testing by a qualified lab, or the expertise or resources to ascertain the true ingredients in the Products prior to their purchase, consumers, including Plaintiffs and Class Members were unable to determine and lacked the knowledge to even consider whether Defendants' Products contained PFAS.

84.      As such, reasonable consumers must, and do, rely on Defendants to accurately and honestly advertise their Products' ingredients, uses, and benefits. And it is reasonable for a consumer to trust Defendants, who have placed such emphasis on trust and transparency, not to contradict those representations by using lab-made chemicals with known risks to human health in their Products. Such misrepresentations are material to the purchasing decisions of reasonable consumers.

85. Defendants had exclusive knowledge or the exclusive ability to know of the ingredients used its products, the contents of its products, the ingredient suppliers of its products and what ingredients they used, including whether its Products contained PFAS.

86. Moreover, Defendants were in the best position to know how its Products were being marketed, labeled, and packages, including the content placed on its own websites and marketing materials during the relevant time period.

87. Had Defendants disclosed that its products contain or contained PFAS, Plaintiffs and Class members would not have purchased Defendants' Products, or would have paid significantly less than what they did for them.

88. The false, misleading, and fraudulent statements, as well as the material omissions concerning the quality, safety, grade, and ingredients made by Defendants are material, intentional and careless, and render Defendants' Products less valuable if not worthless.

89. It was and is reasonable and foreseeable that consumers would rely on the representations and omissions made by Defendants concerning their Products. There is no question that the presence of toxins, which are known to be harmful, in Defendants' Products, is a fact that is material to consumers, especially considering the Defendants' commitment to quality, safety, and trustworthiness as they have and continue to advertise.

90. Plaintiffs and Class Members were among the intended recipients of Defendants' deceptive material representations and omissions as described herein.

91. Defendants knew and intended for consumers, such as Plaintiffs and Class Members to pay a premium for their Products when they made the false, misleading, and deceptive representations concerning Products which they knew contained artificial ingredients, known to be harmful to both humans and the environment.

92.     Plaintiffs and Class Members paid money, at a premium, for Defendants' Products which they reasonably expected to be of a quality comparable to, or that exceeds that of Defendants' competitors. Yet, as a result of Defendants' misrepresentations and omissions, as described herein, Plaintiffs and Class Members did not obtain the full value of what they received from Defendants.

93.     Plaintiffs and Class Members have suffered an injury in fact and lost money or property as a result of Defendants' wrongful conduct. Plaintiffs and Class Members did not receive the full value of what they purchased from Defendants, and had they known the truth about the harmful ingredients in Defendant's products, they would not have made the purchase, would have purchased less of, and/or not have paid the premium they did for Defendants' Products.

## VI.     TOLLING OF THE STATUTE OF LIMITATIONS

### A.     Discovery Rule Tolling

94.     Because Defendants concealed the true nature of the Products, class members had no way of knowing about the inclusion of PFAS in the Products.

95.     Within the period of any applicable statutes of limitation, Plaintiffs and members of the proposed Class and Subclasses could not have discovered through the exercise of reasonable diligence that Defendants were concealing the conduct complained of herein.

96.     Plaintiffs and the other class members did not discover, and did not know of, facts that would have caused a reasonable person to suspect that Defendants did not report information within its knowledge to federal and state authorities or consumers; nor would a reasonable and diligent investigation have disclosed that Defendants had concealed information about the inclusion of PFAS in the Products, which was discovered by Plaintiffs only shortly before this action was filed.

97.    For these reasons, all applicable statutes of limitation have been tolled by operation of the discovery rule with respect to claims as to the Products.

**B.    Fraudulent Concealment Tolling**

98.    All applicable statutes of limitation have also been tolled by Defendants' knowing and active fraudulent concealment and denial of the facts alleged herein throughout the period relevant to this action.

**C.    Estoppel**

99.    Defendants were under a continuous duty to disclose to Plaintiffs and the other Class members the true character, quality, and nature of the Products.

100.    Defendants knowingly, affirmatively, and actively concealed or recklessly disregarded the true nature, quality, and character of the Products.

101.    Based on the foregoing, Defendants are estopped from relying on any statutes of limitations in defense of this action.

## VII.    CLASS ALLEGATIONS

102.    Plaintiffs bring this action on behalf of themselves and as a class action, pursuant to the provisions of Rules 23(a), (b)(2), (b)(3), and (c)(4) of the Federal Rules of Civil Procedure, on behalf of the following class and subclasses:

> **Nationwide Class**: All persons or entities who purchased the Products.
>
> **Michigan Subclass**: All persons or entities who purchased the Products in the State of Michigan.

103.    Excluded from the definitions of each Class and Subclass are any personal injury or wrongful death claims resulting from the Products. Also excluded from the Class and Subclasses are Defendants and its subsidiaries and affiliates; all persons who make a timely election to be excluded from this action; governmental entities; the Judge to whom this case is assigned and

his/her immediate family; and Plaintiffs' Counsel. Plaintiffs reserve the right to revise the Class and Subclass definitions based upon information learned through discovery.

104.     Certification of Plaintiffs' claims for class-wide treatment is appropriate because Plaintiffs can prove the elements of their claims on a class-wide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claim.

105.     This action has been brought and may be properly maintained on behalf of the Classes and Subclasses proposed herein under Federal Rule of Civil Procedure 23.

106.     **Numerosity**. The members of each Class and Subclass are so numerous and geographically dispersed that individual joinder of all Class members is impracticable. For purposes of this complaint, Plaintiffs allege that the Products have been many thousands of times to consumers across the country. The precise number of Class and Subclass members is unknown to Plaintiffs but may be ascertained from Defendants' books and records. Class and Subclass members may be notified of the pendency of this action by recognized, Court-approved notice dissemination methods, which may include U.S. Mail, electronic mail, Internet postings, and/or published notice.

107.     **Commonality and Predominance:** This action involves common questions of law and fact, which predominate over any questions affecting individual Class and Subclass members, including, without limitation:

      a.      Whether the Products contain PFAS;

Whether Defendants engaged in the conduct alleged herein;

      b.      Whether Defendants' representations to Class members were misleading;

      c.      When Defendants first knew about the inclusions of PFAS in the Products;

d.      Whether Defendants designed, manufactured, marketed, and distributed the Products with PFAS;

e.      Whether Defendants omitted material information regarding PFAS in the Products to Class members;

f.      Whether Defendants' conduct renders them liable for breach of express warranties and breach of implied warranty of merchantability;

h.      Whether Defendants have been unjustly enriched at the expense of Plaintiffs and the Class and Subclasses;

i.      Whether Plaintiffs and the other Class and Subclass members overpaid for the Products; and

j.      Whether Plaintiffs and the other Class and Subclass members are entitled to damages and other monetary relief and, if so, in what amount.

108.    **Typicality**: Plaintiffs' claims are typical of the other Class and Subclass members' claims because, among other things, all Class and Subclass members were comparably injured through Defendants' wrongful conduct as described above and all Plaintiffs and Class members purchased the Products.

109.    **Adequacy**: Plaintiffs are adequate Class and Subclass representatives because their interests do not conflict with the interests of the other members of the Class and Subclasses they seek to represent; Plaintiffs have retained counsel competent and experienced in complex class action litigation; and Plaintiffs intend to prosecute this action vigorously. The Class and Subclass' interests will be fairly and adequately protected by Plaintiffs and their counsel.

110.    **Superiority**: A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. The damages or other financial detriment suffered by Plaintiffs and the other Class and Subclass members are relatively small compared to the burden and expense that would be required to individually litigate their claims against Defendants, so it

would be impracticable for the members of the Class and Subclasses to individually seek redress

for Defendants' wrongful conduct. Even if Class and Subclass members could afford individual

litigation, the court system could not. Individualized litigation creates a potential for inconsistent

or contradictory judgments and increases the delay and expense to all parties and the court system.

By contrast, the class action device presents far fewer management difficulties and provides the

benefits of single adjudication, economy of scale, and comprehensive supervision by a single

court.

## VIII.   CLAIMS

### COUNT I

**FRAUDULENT CONCEALMENT**
**(COMMON LAW)**
**(Alleged by Plaintiffs Castle and Baldwin-Jones on behalf of the Nationwide Class or, in the alternative, the Michigan Subclass)**

111.   Plaintiffs reallege the foregoing allegations as if fully set forth herein.

112.   Under Michigan law: (i) Defendants had a duty to disclose material facts in

connection with the sale of the Products; (ii) Defendants either (a) knowingly made a false

representation concerning material information in connection with the sale of the Products, or

(b) knowingly concealed material information in connection with the sale of the Products, or

(c) knowingly failed to disclose material information in connection with the sale of the Products;

and (iii) as a result of Defendants' conduct, Plaintiffs suffered economic damages.

113.   Defendants concealed and suppressed material facts concerning the toxic PFAS that

is found in the Products.

114.   Defendants sold the Products to Plaintiffs without disclosing the true nature of the

Products, including the PFAS, and concealed and suppressed such information from Class

members.

115.    Defendants concealed and suppressed the true nature of the Products, as well as the PFAS, with the intent to deceive Plaintiffs.

116.    Defendants did so in order to falsely assure purchasers of the Products that the Products were safe and reliable. The concealed information was material to consumers, both because it concerned the quality and safety of the Products and because the information would have significantly decreased the value and sales price of the Products.

117.    Defendants had a duty to disclose the true nature of the Products, as well as the PFAS, because it was known and only knowable by Defendants; Defendants had superior knowledge and access to the facts; and Defendants knew the facts were not known to, or reasonably discoverable by, Plaintiffs. Defendants also had a duty to disclose because it made many affirmative representations about the safety and quality of the Products, as set forth above; these representations were misleading, deceptive, and incomplete without the disclosure of the inclusion of the PFAS in the products. Having provided information to Plaintiffs, Defendants had the duty to disclose not just the partial truth, but the entire truth. Finally, Defendants had a continuing duty to monitor the manufacture of the Products as new Products were being sold.

118.    Defendants concealed and/or suppressed these material facts, in whole or in part, to protect its profits, and it did so at the expense of Plaintiffs and the Subclass.

119.    On information and belief, Defendants have still not made full and adequate disclosure and continues to defraud Plaintiffs and conceal material information regarding the PFAS in the Products.

120.    Plaintiffs were unaware of these omitted material facts and would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have

purchased the Products or would have paid less for the Products. Defendants were in exclusive control of the material facts and such facts were not known to the public, including Plaintiffs.

121.    Because of Defendants' concealment, suppression, and/or omission of the facts, which Plaintiffs and the Class members relied on, Plaintiffs sustained damage. In purchasing the Products, Plaintiffs did not get the benefit of their bargain since the Products were worth less than they would have been without the PFAS. Had Plaintiffs been aware of the PFAS that exists in the Products, Plaintiffs would have paid less for the Products or would not have purchased them at all.

122.    Accordingly, Defendants are liable to Plaintiffs and the Class for damages in an amount to be proven at trial.

123.    Defendants' acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' rights and well-being in order to enrich Defendants. Defendants' conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

### COUNT II

### FRAUDULENT OMISSION
### (COMMON LAW)
**(Alleged by Plaintiffs Castle and Baldwin-Jones on behalf of the Nationwide Class or, in the alternative, the Michigan Subclass)**

124.    Plaintiffs reallege the foregoing allegations as if fully set forth herein.

125.    Defendants were aware of the existence of PFAS within the Products, as well as the true nature of the Products as a whole, when it marketed and sold the Class Vehicles to Plaintiffs and the Class.

126.    Having been aware of the PFAS within the Products, as well as the true nature of the Products as a whole, and having known that Plaintiffs and the other members of the Class could not have reasonably been expected to know these material facts, Defendants had a duty to disclose

- 27 -

these facts to Plaintiffs and the other members of the Class in connection with the sale of the Products.

127.    Defendants did not disclose the existence of the PFAS or the true nature of the Products to Plaintiffs and the Class in connection with the sale of the Products.

128.    For the reasons set forth above, the PFAS within the Products comprises material information with respect to the sale of the Products.

129.    In purchasing the Products, Plaintiffs and the other members of the Class reasonably relied on Defendants to disclose known material defects with respect to the Products.

130.    Had Plaintiffs and the other members of the Class known of the true nature of the Products, including the existence of PFAS, they would not have purchased the Products or would have paid less for them.

131.    Through its omissions regarding the true nature of the Products, as well as the existence of PFAS, Defendants intended to induce, and did induce, Plaintiffs and the other members of the Class to either purchase Products that they otherwise would not have purchased, or pay more for a Product than they otherwise would have paid.

132.    As a direct and proximate result of Defendants' omissions, Plaintiffs and the other members of the Class either overpaid for the Products or would not have purchased the Products at all if the true nature of the Products, including the existence of PFAS, had been disclosed to them and, therefore, have incurred damages in an amount to be determined at trial.

<div align="center">

**COUNT III**

**UNJUST ENRICHMENT**
**(COMMON LAW)**
**(Alleged by Plaintiffs Castle and Baldwin-Jones on behalf of the Nationwide Class or, in the alternative, the Michigan Subclass)**

</div>

133.    Plaintiffs reallege the foregoing allegations as if fully set forth herein.

134.    Defendants have received and retained a benefit from Plaintiffs and Class members and inequity has resulted.

135.    Defendants have benefitted from selling and distributing the Products for more than they were worth as a result of Defendants' conduct, and Plaintiffs and Class members have overpaid for the Products and been forced to purchase different band-aid products that do not contain PFAS.

136.    Thus, Plaintiffs and the Class conferred a benefit on Defendants.

137.    It is inequitable for Defendants to retain these benefits.

138.    Plaintiffs and the Class were not aware of the true facts about the Products and did not benefit from Defendants' conduct.

139.    Defendants knowingly accepted the benefits of its unjust conduct.

140.    As a result of Defendants' conduct, the amount of its unjust enrichment should be determined in an amount according to proof.

## COUNT IV

**VIOLATIONS OF THE MICHIGAN CONSUMER PROTECTION ACT ("MCPA)**
**(Mich. Comp. Laws § 445.903, *et seq.*)**
**(Alleged by Plaintiffs Castle and Baldwin-Jones on behalf of the Michigan Subclass)**

141.    Plaintiffs reallege the foregoing allegations as if fully set forth herein.

142.    Plaintiffs and members of the Michigan Subclass are "persons" within the meaning of Mich. Comp. Laws. § 445.902(1)(d).

143.    The Michigan Consumer Protection Act ("Michigan CPA") prohibits "[u]nfair, unconscionable, or deceptive methods, acts, or practices in the conduct of trade or commerce . . . ." Mich. Comp. Laws § 445.903(1).

144.    Defendants' conduct as set forth herein constitutes unfair or deceptive acts or practices, including, but not limited to, Defendants' manufacture and sale of the Products, which

Defendants failed to adequately investigate, disclose and remedy, and their misrepresentations and omissions regarding the safety, reliability, and true nature of the Products.

145.    Defendants' conduct as alleged above and herein constitutes practices prohibited by the Michigan CPA, including: "(c) Representing that goods or services have … characteristics . . . that they do not have . . . .;" "(e) Representing that goods or services are of a particular standard . . . if they are of another;" "(s) Failing to reveal a material fact, the omission of which tends to mislead or deceive the consumer, and which fact could not reasonably be known by the consumer;" "(bb) Making a representation of fact or statement of fact material to the transaction such that a person reasonably believes the represented or suggested state of affairs to be other than it actually is;" and "(cc) Failing to reveal facts that are material to the transaction in light of representations of fact made in a positive manner." Mich. Comp. Laws § 445.903(1).

146.    Defendants' actions as set forth above occurred in the conduct of trade or commerce.

147.    Defendants intended that Plaintiffs and the Michigan Subclass members rely on their misrepresentations and omissions, so that the Plaintiffs and the Michigan Subclass members would purchase the Products.

148.    Had Defendants disclosed the omitted material, Plaintiffs and the members of the Michigan Subclass would not have purchased the Products or would have paid less for them.

149.    Defendants' violations present a continuing risk to Plaintiffs and members of the Michigan Subclass as well as to the general public. Defendants' unlawful acts and practices complained of herein affect the public interest.

150.    Plaintiffs and the Michigan Subclass members were injured as a result of Defendants' conduct. Plaintiffs and the Michigan Subclass overpaid for the Products and did not receive the benefit of their bargain.

151.    Defendants' conduct proximately caused the injuries to the Plaintiffs and the Michigan Subclass members.

152.    Defendants are liable to Plaintiffs and the Michigan Subclass for damages in amounts to be proven at trial, including attorneys' fees, costs, and treble damages.

<div align="center">

**COUNT V**

**BREACH OF IMPLIED WARRANTY OF
MERCHANTABILITY UNDER MICHIGAN LAW
(Mich. Comp. Laws Ann. § 440.2314)
(Alleged by Plaintiffs Castle and Baldwin-Jones on behalf of the Michigan Subclass)**

</div>

153.    Plaintiffs reallege the foregoing allegations as if fully set forth herein.

154.    Defendants are "merchants" within the meaning of Mich. Comp. Laws Ann. § 440.2104.

155.    Under Michigan law, an implied warranty of merchantability attaches to the Products. Mich. Comp. Laws Ann. § 440.2314.

156.    The Products were not merchantable when sold or leased because they contained dangerous PFAS that poses great risk to any individual who uses the Product. The inclusion of PFAS renders the Products when sold and at all times thereafter, unmerchantable and unfit for their ordinary use of bandaging wounds. The purpose of bandages is to heal wounds and improve the health of the individual using the bandage. The inclusion of PFAS in the products introduces toxic chemicals to the individual, which are a detriment to the health of the individual.

157.    As such, the Products violate Mich. Comp. Laws. Ann. § 440.2314.

<div align="center">

- 31 -

</div>

158. The Products were defective at the time of sale when they were under the exclusive control of Defendants. The PFAS detailed herein were latent and not reasonably discoverable by Plaintiffs or Subclass members.

159. As a direct and proximate result of Defendants' breach of the implied warranty of merchantability, Plaintiffs have been damaged in an amount to be determined at trial.

## COUNT VI

### BREACH OF EXPRESS WARRANTY
### UNDER MICHIGAN LAW
### (Mich. Comp. Laws Ann. § 440.2313)
### (Alleged by Plaintiffs Castle and Baldwin-Jones on behalf of the Michigan Subclass)

160. Plaintiffs reallege the foregoing allegations as if fully set forth herein.

161. Defendants are and were at all relevant times a "merchant" under Mich. Comp. Laws §440.2104.

162. The Products are and were at all relevant times "goods" within the meaning of Mich. Comp. Laws Ann. §§ 440.2105(1).

163. Defendants provided Plaintiffs and Michigan Subclass members with one or more express warranties in connection with the purchase of the Products. In connection with their sale of the Products, by and through statements in labels, packaging, and ingredient lists, and other written materials intended for consumers and the general public, Defendants made certain express affirmations of fact and/or promises relating to their bandages, and made such affirmations and promises to Plaintiffs and the Michigan Subclass, as alleged herein.

164. Defendants marketed the Products as high quality, reliable, and safe, and that Defendants would stand behind the quality of its products. These statements helped conceal the existence of the PFAS from Plaintiffs and Michigan Subclass members.

165.    By way of examples, such affirmations and promises include: "Every piece of material in our BAND-AID Brand bandages and every ingredient in our antibiotic treatments are chosen with safety as the top concern. We thoroughly vet each supplier and only partner with those who meet our rigorous standards;" "Our over-the-counter active ingredients have proven to be the best quality through safety assurance processes and ongoing evaluation;" "Our manufacturing facilities undergo regular audits and certification so that we can ensure our products are manufactured with the highest standards and comply with most discerning regulatory standards;" and "Our scientists ensure the safety and efficacy of our products through clinical studies and laboratory models."

166.    Defendants advertised, labeled, marketed, and promoted the Products with such express affirmations of fact and/or promises in such a way as to induce Plaintiffs and Subclass members to purchase and use the Products, thereby making an express warranty that the bandages would conform to the representations of being safe; meet scientific and medical, and regulatory standards; and be subjected to appropriate studies and testing. Defendants' affirmations of fact and/or promises about the Band-Aid brand adhesive bandages, as set forth herein, constituted affirmations of fact or promises made by the seller to the buyer, which related to the goods and became part of the basis of the bargain.

167.    Plaintiffs and members of the Michigan Subclass were induced to purchase the Products under false and/or fraudulent pretenses. Despite the existence of the warranties, Defendants failed to adequately inform Plaintiffs and members of the Michigan Subclass that the Products contained PFAS.

168.    On information and belief, Defendants have not made any changes to the Products to remedy the existence of PFAS.

169.    Defendants had sole access to material facts concerning the contents of their Products and the nature of the risks associated with the use of the Products, as Defendants expressly stated on their labels and website the safety of the bandages, and knew that consumers and purchasers, such as Plaintiffs and Subclass members, could not have reasonably discovered that the express statements were inadequate and inaccurate.

170.    Plaintiffs and each member of the Class have had sufficient direct dealings with Defendants or their agents (including distributors, dealers, and authorized sellers) to establish privity of contract between Defendants and Plaintiffs and each member of the Class.

171.    Defendants were provided notice by Plaintiffs of their breach of express warranties by the filing of this complaint. Despite this notice, Defendant did not cure its breach of express warranties.

172.    As a direct and proximate result of Defendant's breach of express warranties, Plaintiffs and members of the Michigan Subclass have been damaged in an amount to be determined at trial.

173.    Finally, because of Defendant's breach of express warranty as set forth herein, Plaintiffs and Michigan Subclass members assert, as additional and/or alternative remedies, the revocation of acceptance of the goods and the return to Plaintiffs and Michigan Subclass members of the purchase price of all Products, and for such other incidental and consequential damages as allowed.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of members of the Class and Subclasses, respectfully request that the Court enter judgment in their favor and against Defendants, as follows:

A.      Certification of the proposed Nationwide and Michigan Subclass, including appointment of Plaintiffs' counsel as Class Counsel;

B.      Restitution, including at the election of Class and Subclass members, recovery of the purchase price of the Products, or the overpayment for the Products;

C.      Damages, including punitive damages, costs, and disgorgement in an amount to be determined at trial;

D.      Injunctive relief as pleaded or as the Court may deem proper;

E.      An order requiring Defendants to pay both pre- and post-judgment interest on any amounts awarded;

F.      An award of costs and attorneys' fees; and

G.      Such other or further relief as may be appropriate.

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a jury trial for all claims so triable.

DATED: May 13, 2024                    Respectfully submitted,

<div style="margin-left: 40%;">

*/s/ James E. Cecchi*
James E. Cecchi
**CARELLA BYRNE CECCHI
BRODY & AGNELLO, P.C.**
5 Becker Farm Road
Roseland, New Jersey 07068
Telephone: (973) 994-1700
jcecchi@carellabyrne.com

E. Powell Miller*
Dennis A. Lienhardt*
**THE MILLER LAW FIRM PC**
950 W. University Drive, Suite 300
Rochester, MI 48307
Telephone: (248) 841-2200
epm@millerlawpc.com
dal@millerlawpc.com

</div>

*Counsel for Plaintiffs and the putative Class*

\* *pro hac vice* applications forthcoming